## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**VINCENT C. RICKERT,**

    *Plaintiff,*

*vs.*                        **Civil Action No. 1:07CV122**
                              **(The Honorable Irene M. Keeley)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

    *Defendant.*

### REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 83.12.

### I. Procedural History

Vincent C. Rickert ("Plaintiff") filed an application for SSI and DIB on January 3, 2005, and January 11, 2005, respectively, alleging disability since December 30, 2001, due to "problems with right foot and back" (R. 52-54, 65, 282-83). Plaintiff's applications were denied at the initial and reconsideration levels (R. 276, 295, 301). Plaintiff requested a hearing, which Administrative Law Judge Norma Cannon ("ALJ") held on July 5, 2006, and at which Plaintiff, a witness for Plaintiff, and Larry Bell, Vocational Expert ("VE") testified (R. 306-26). On September 12, 2006, the ALJ

entered a decision finding Plaintiff was not disabled and that there existed a significant number of jobs in the national economy Plaintiff could perform (R. 16-21). On October 24, 2006, Plaintiff requested a review of the ALJ's decision by the Appeals Council (R. 11-12). On July 13, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5-8).

## II. Statement of Facts

Plaintiff, who was born in 1957, was forty-nine years old when the ALJ issued her decision (R. 20, 49). Plaintiff graduated from high school and attended college for one year (R. 69, 311). From 1990 into 1999, he worked as a laborer (R. 66).

On December 10, 2002, Plaintiff presented to Dr. Dung S. Le, a podiatrist, at the Clarksburg Veterans' Affairs Medical Center ("CVAMC") with complaints of "painful hyperkeratotic lesions on the plantar aspects of both feet" and thick nails (R. 216). Upon examination, it was determined Plaintiff was neurologically grossly intact in both lower extremities; had no infection, edema, clubbing, or cyanosis; thick, crumbly, yellow, brittle, and dystrophic nails; and calluses on both feet. He was diagnosed with hyperkeratotic lesions and onychomycosis[1] and treated with Lamisil (R. 217).

On March 11, 2003, Plaintiff reported to Dr. Le at CVAMC that he did not complete his Lamisil treatment because he could not swallow pills. Plaintiff stated he would "live with the fungus." He complained of painful intractable plantar keratosis (IPK)[2] at subsecond right foot (R.

---

[1]Onychomycosis: tinea unguium. (*See* Fn.5). *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 1309.

[2]Intractable plantar keratosis: a horny growth, such as a wart or callus, on the sole of the foot, which is resistant to cure, relief or control. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 946, 975, 1445.

2

215). Upon examination, Plaintiff's pedal pulses were palpable, bilaterally; his skin was intact, except for the IPK; he had pain in right foot, upon palpation; he was grossly intact, neurologically, in both lower extremities; he had thick, yellow, brittle, crumbly, and dystrophic nails; and he had no edema, clubbing, or cyanosis. Plaintiff was diagnosed with painful interphalangeal keratosis[3], subsecond, right foot, and onychomycosis. He was scheduled for a plantar condylectomy[4] and debridement of his nails (R. 216).

Also on March 11, 2003, a x-ray of Plaintiff's right foot, made at CVAMC, showed mild changes associated with degenerative arthritis, but no other significant skeletal or soft tissue abnormalities were found (R. 230).

On March 31, 2003, Plaintiff presented to Dr. Le at CVAMC for follow-up care for his right foot (R. 211). Plaintiff's pedal pulses were palpable, bilaterally; except for the subsecond, right foot IPK, his skin was intact; he was grossly intact neurologically, in his lower extremities; his nails were thick, yellow, brittle, crumbly, and dystrophic; he had no edema, clubbing or cyanosis; his extremities were normal (R. 211-12). Dr. Le diagnosed painful interphalangeal keratosis, subsecond, right foot, and onychomycosis (R. 212).

On March 31, 2003, a x-ray was made of Plaintiff's chest at CVAMC. It revealed no pulmonary infiltrates, pleural effusions, or pneumothorax. The results were conclusive for no evidence of an acute cardiopulmonary process (R. 228).

Also on March 31, 2003, at CVAMC, Plaintiff underwent an ECG, which was abnormal due

---

[3]Interphalangeal keratosis: a horny growth, such as a wart or callus, situated between two contiguous phalanges. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 943, 975.

[4]Plantar condylectomy: excision of a condyle located on the sole of the foot. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 406, 1445.

to "sinus rhythm, nsst-t changes" and "baseline artifacts." It was noted there was no previous ECG to which to compare it (R. 226).

On April 7, 2003, a cardiology note was made of Plaintiff at CVAMC. Mitchell S. Finkel, M.D., wrote that, due to a "possible abnormal EKG," Dr. Le had requested a review in order to obtain preoperative clearance. Plaintiff stated he had "been healthy all his life" (R. 209). Plaintiff stated he had not experienced chest pain, palpitations, shortness of breath, or syncope. Plaintiff's blood pressure was elevated at 153/93 (R. 208).

Plaintiff's examination by Dr. Finkel was normal (R. 209). Dr. Finkel "walked the [Plaintiff] up 6 flights of stairs to see how well he tolerated the stress." He opined such exertion was "no problem at all for him," as he did not develop chest pain, shortness of breath, syncope, or elevated heart rate (R. 210).

Dr. Finkel found Plaintiff was in "reasonable condition with no evidence of any heart or pulmonary disease that would warrant cancellation of surgery." Dr. Finkel diagnosed hypertension and recommended Plaintiff lose weight, but, until he did, that he should medicate the condition. Dr. Finkel prescribed a combination of Hydrochlorothiazide and Lisinopril for high blood pressure treatment. Dr. Finkel encouraged Plaintiff to be more active and "get in better shape" (R. 210).

On April 10, 2003, Dr. Le performed a plantar condylectomy of the second metatarsal head of the right foot at of Plaintiff at CVAMC (R. 203-06, 222-23).

On April 14, 2003, Plaintiff presented to Dr. Le at CVAMC for surgery follow up. Dr. Le noted Plaintiff was afrebrile and the wound was well-coapted. He did observe some redness and prescribed Cipro to treat a possible infection (R. 202-03).

On April 21, 2003, Plaintiff presented to Dr. Le at CVAMC for post-surgery examination.

4

Dr. Le found the wound was well healed and there was no sign of infection. The Plaintiff stated he experienced no "further problems" with his foot (R. 201).

On July 1, 2003, Plaintiff presented to Dr. Russell Brooke at CVAMC for a mood/depression screening. Plaintiff stated he had felt sad; had lost interest in things he used to enjoy; had an increase/decrease in appetite; had difficulty sleeping; had felt restless and was unable to stand/sit; experienced tiredness and loss of energy; felt worthless or guilty; had difficulty concentrating, thinking, remembering, or making decisions; but had no thoughts of death or suicide. Plaintiff stated he was limited in walking, weight lifting, and lying down (R. 199). Plaintiff stated he was medicating with HCTZ 12.5 and Lisinopril for hypertension (R. 200).

Also on July 1, 2003, Plaintiff presented to Sidney B. Jackson, M.D., at CVAMC, for treatment of hypertension. Plaintiff reported he had been experiencing right paralumbar muscle pain with "quite a bit of spasm and discomfort" (R. 196). Plaintiff reported he had not taken Terbinafine, as prescribed for his feet, because he could not swallow pills (R. 197).

Plaintiff informed Dr. Jackson he was depressed and upset because he fiancée had been diagnosed with breast cancer. Dr. Jackson noted Plaintiff appeared depressed with anhedonia and was stoic. Plaintiff reported poor sleep. Plaintiff's physical examination was normal. Dr. Jackson observed a callus on the ball of the right foot (R. 197).

Dr. Jackson diagnosed hypertension and increased the dosage of Hydrochlorothiazide and Lisinopril. He instructed Plaintiff to crush the medication into food and consume it. He prescribed Sertraline for what he "believe[d]" was depression and referred Plaintiff to the Mental Health

Department of CVAMC. Dr. Jackson diagnosed tinea unguium[5] and tinea pedis[6], for which he prescribed Terbinafine. Dr. Jackson found Plaintiff had chronic low back pain, which had been present since Plaintiff's foot surgery. He opined Plaintiff did not have reflex sympathetic dystrophy and referred him to physical therapy and ordered a x-ray of Plaintiff's lumbar spine. He instructed Plaintiff to return to his care in six months (R. 197).

On July 1, 2003, Plaintiff had x-rays made of his lumbosacral spine at CVAMC, which showed a cyst in the right wing of the sacrum and a normal lumbar spine (R. 227).

On November 17, 2003, Dr. Le, of CVAMC, examined Plaintiff's feet and found his nails were yellow, brittle, crumbly, and dystrophic. He diagnosed mycotic nails and IPK. He performed a reduction of mycotic nails and debridement of IPK (R. 195-96).

On November 21, 2003, Plaintiff presented to Philip Cromer, a psychology trainee/intern at CVAMC, for mild depression. Plaintiff stated he had recurring "problem[s]" with his foot but that he was "doing ok," as he had "lots of family to talk to and [his] four girls [to] keep [him] busy" (R. 194). Plaintiff stated he was engaged "to a 'good woman' and [was] looking forward to getting married (R. 195). Mr. Cromer found Plaintiff was oriented in all spheres and that his affect was congruent with is mood (R. 194). Plaintiff stated he had held two jobs at one time (UPS and Sears),

---

[5]Tinea unguium: tinea involving nails, usually caused by a combination of bacteria and fungi, particularly species of Candida; it is usually is seen first as white patches or pits on the nail surface or around its edges, followed by establishment of infection beneath the nail plate. Called also onychomycosis or dermatophytic onychomycosis and ringworm of the nail. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 1914.

[6]Tinea pedis: tinea involving the feet, particularly the interdigital spaces and soles, most often caused by Trichophyton rubrum, T. Mentagrophytes, or Epidermophyton floccosum, and characterized by intensely pruritic lesions varying from mild, chronic, and scaling to acute exfoliative, pustular, and bullous. Called also athlete's foot and ringworm of the foot. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 1914.

but had not worked for approximately one or two years because of his "problem" with is foot. Plaintiff denied any history of psychiatric symptoms or treatment. Mr. Cromer found the following: Axis I – no diagnosis; Axis II – no diagnosis; Axis III – chronic foot problem; Axis IV – none; Axis V – 71. Mr. Cromer noted Plaintiff refused any additional mental health treatment (R. 195).

On January 22, 2004, Plaintiff presented to Robert K. Lough, M.D., at CVAMC, for low back pain, dermatophytosis[7], tinea unguium, and hypertension. Plaintiff stated he had experienced low back pain since his foot surgery and, more specifically, because his ambulation pattern had changed in his effort to compensate for his foot condition. Plaintiff stated if he could walk "more normally . . . his back would improve." Plaintiff's strength was 3+/5 in his right foot and ankle and 5/5 elsewhere. Upon testing Plaintiff's sensation and reflexes, Dr. Lough found pain present on light touch. Plaintiff's balance was fair and he could stand independently, except he could not place weight properly on his forefoot without increase in pain. Dr. Lough found Plaintiff's ambulation was antalgic due to pain. Plaintiff's right foot had an open area on the "MT region plantarly" and his entire foot was tender to palpation (R. 193). Dr. Lough opined the majority of Plaintiff's low back pain was a "direct result of his accommodative method of ambulation due to his right foot pain." He noted that if the pressure could be relieved from Plaintiff's foot during ambulation, his gait could be normalized and his low back symptoms would improve. Dr. Lough provided Plaintiff with a pair of crutches and "an orthowedge to reduce pressure off right forefoot during" ambulation (R. 194).

---

[7]Dermatophytosis: any superficial fungal infection caused by a dermatophyte and involving the stratum corneum of the skin, hair, and nails, including onychomycosis and the various forms of tinea. Called also epidermomycosis and epidermophytosis. Tinea pedis. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 498.

On February 3, 2004, Russell Biundo, M.D., completed a consultative examination of Plaintiff. Plaintiff informed Dr. Biundo that his distal metatarsal pain at the metatarsal phalangeal junction began in June, 2003. Plaintiff reported he had undergone resection of the metatarsal phalangeal and had worn a modified shoe in an effort to avoid discomfort. The growth recurred and was described by Plaintiff as "a hardened callus." Plaintiff stated weight bearing, walking, and standing caused pain. Plaintiff reported his foot pain was "completely eliminated" with non-weight bearing. Dr. Biundo observed no edema or erythema. Plaintiff reported his back had been "a little sore" due to his having "walk[ed] funny." Plaintiff reported he medicated with anti-hypertensive medications (R. 140).

Dr. Biundo found, upon examination, that Plaintiff had no migratory arthralgia, no weakness in his upper extremities, no paresthesia, no abdominal pain, no GI complaints, no dizziness, no vertigo, no epigastric distress, no cough, no upper back or neck pain, and no significant low back pain "although he [felt] a little tight once in a while" (R. 140-41). Dr. Biundo found Plaintiff's ranges of motion in the upper and lower extremities were normal. Plaintiff had no tremors, normal reflexes, intact balance and coordination, normal neuromuscular status, normal range of motions of the toes, and excellent capillary refill. Dr. Biundo found Plaintiff's right dorsum foot revealed evidence of the old surgical wound and a plantar wart on the plantar surface of the right foot. Plaintiff's foot was tender, indurated, and hyperkeratoic. Dr. Biundo opined Plaintiff's "main problem [was] the right foot, hyperkeratotic region" and that "[c]linically it appear[ed] to be consistent with a plantar wart" that had recurred. He noted Plaintiff's previous x-rays of his right foot did not show "any evidence of bony erosions or any insult to the bony cortex . . . ." Dr. Biundo opined that Plaintiff's foot condition could "be treated and corrected" and Plaintiff could "return to

a functional normal lifestyle." Dr. Biundo found Plaintiff required an evaluation by an ankle/foot specialist (R. 141).

On February 9, 2004, Plaintiff presented to Dr. Lough, at CVAMC, for treatment low back pain. Plaintiff informed Dr. Lough that he had realized significant reduction of pain in his "L/S spine" but continued to experience chronic right foot pain. Dr. Lough noted Plaintiff's foot wound was "healing some" and had a "soft callous tissue build up." Dr. Lough debrided the right foot wound (R. 192).

On February 23, 2004, Fulvio R. Franyutti, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 145). Dr. Franyutti found Plaintiff had no postural, manipulative, visual, or communicative limitations (R. 146-48). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold, but that his exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards was unlimited (R. 148). Dr. Franyutti reduced Plaintiff's RFC to medium (R. 149).

On March 5, 2004, Plaintiff had x-rays made of his right foot at Veterans' Affairs Medical Center in Pittsburgh, Pennsylvania ("PAVAMC"). It showed mild degenerative changes at the interphalangeal joints and first metatarsophalangeal joint. A slight posterolateral subluxation of the proximal phalanx at the first metatarsophalangeal joint[8] was suggested. Cortical[9] destruction along

---

[8]Posterolateral subluxation of the proximal phalanx at the first metatarsophalangeal joint: an incomplete or partial dislocation, situated to the side of and at the back of, or in the back part of, the bone nearest to the metartarsus and phalanges of the first joint. *Dorland's Illustrated*

the medial surface at the distal end of the second metatarsal was suggested. A smoothly marginated bony exostosis along the lateral surface of the distal second metatarsal was observed (R. 154).

On March 5, 2004, Plaintiff presented to PAVAMC for treatment of his right foot condition. Upon examination, Whitney A. Holsopple, D.P.M., found Plaintiff's pedal pulses were palpable and epicritic sensation was intact. Plaintiff's toenails were dystrophic, elongated, discolored, and hypertrophic. Dr. Holsopple found a large hyperkeratotic lesion at the plantar aspect of Plaintiff's second metatarsal head on the right foot and a bone spur that was protruding plantarly from the second metatarsal neck area. Dr. Holsopple found Plaintiff was "extremely tender and painful anywhere in the forefoot with palpation," but that there was "disparity at times [upon examination because] areas that were very painful at one time, touch him again and they are not painful." He noted x-rays were made of the right foot that date and they showed the "foot look[ed] like healed osteotomy of the second metatarsal neck" (R. 152).

Dr. Holsopple diagnosed bone spur, status post second metatarsal osteotomy, and onychomycosis. Dr. Holsopple minimally debrided Plaintiff's foot lesion. Dr. Holsopple discussed future treatment options with Plaintiff, which included living with the pain, accommodative inserts and/or cutouts for his shoe, full debridement, or surgically remodel the bone. Dr. Holsopple recommended Plaintiff "be anesthetized locally" and full debridement as his preferred choice of treatment; Plaintiff refused to proceed due to his "fear of needles." Plaintiff chose to treat with inserts. Dr. Holsopple wrote that "[i]t should be noted that . . . [Plaintiff] asked for a pain reliever,

_Medical Dictionary_, 29th Ed., 2000, at 1138, 1413, 1494,1530, 1779.

[9]Cortical: pertaining to or of the nature of a cortex or bark. _Dorland's Illustrated Medical Dictionary_, 29th Ed., 2000, at 425.

actually the [Plaintiff] and his wife [sic] asked for Percocet, but instead of that, we want to give him some Darvocet," which was prescribed to be taken, one tablet before bed (R. 152).

On October 19, 2004, Dr. Jackson examined Plaintiff at CVAMC. He noted Plaintiff had "not been in to see [him] for over a year." Plaintiff informed Dr. Jackson that his toenail condition had not improved with the use of Terbinafine (R. 185). Dr. Jackson found Plaintiff had a large corn on the "ventral aspect of his" right foot; Plaintiff requested a referral to podiatry for that condition. Plaintiff reported that his low back pain caused him to stay awake at night and that Sertraline "did not help him much" (R. 186).

Upon examination, Dr. Jackson found Plaintiff's HEENT, respiratory, cardiovascular, gastrointestinal, genitourinary, lung, abdomen, and neurological systems normal (R. 186-87). Plaintiff's musculoskeletal examination revealed low back pain and a "foot problem." Plaintiff's blood pressure was 152/100. Dr. Jackson noted Plaintiff had not been medicating his hypertension. Plaintiff was alert, oriented, and pleasant (R. 186). Dr. Jackson noted Plaintiff's extremity examination was normal, except for a "significant large horny growth of his keratotic mycotic nails . . . bilaterally and . . . under the base of his second and third metatarsals a large corn . . . [that was] quite tender to palpation" (R. 187).

Dr. Jackson's assessment was for "not well controlled" blood pressure and recommended treatment of same with Lisinopril and Hydrochlorothiazide; tinea unguium with continuing foot problems and pain, for which he referred Plaintiff to a podiatrist; and chronic low ack pain, for which he prescribed Tylenol #3 (R. 187).

In conjunction with his appointment with Dr. Jackson, Plaintiff was interviewed by LPN Brooke Russell on October 19, 2004, at CVAMC (R. 183). Plaintiff informed Nurse Russell that

his pain was at a "9" level. Plaintiff stated he had no PTSD symptoms. Plaintiff informed Nurse Russell that he had not been "feeling down, depressed, or hopeless" or "having little interest or pleasure in doing things" for the past month. Nurse Russell reported Plaintiff's depression screening was negative (R. 184).

On November 19, 2004, Plaintiff presented to CVAMC for a reading of his blood pressure. Plaintiff's blood pressure was 168/100 and then 142/92 on the repeat read. Dr. Jackson increased Plaintiff's hypertension medication (R. 182).

On January 25, 2005, Dr. Le completed a podiatry examination of Plaintiff at CVAMC. Dr. Le noted Plaintiff realized only moderate resolution of his foot condition with the plantar condylectomy of the second metatarsal head, right side, he had performed nine months earlier. Dr. Le found Plaintiff's IPK had recurred. Plaintiff complained of moderate to severe pain in that area of his foot with weight bearing. Plaintiff's gait was "apropulsive on the right side" and he walked on his heel. Dr. Le found Plaintiff's neurovascular status was intact in his lower extremities, bilaterally, and he had no clubbing, edema, or cyanosis. Plaintiff's toenails were "thick, yellow, brittle, crumbly and dystrophic" and he had a "mild to moderate size IPK, subsecond, right side, with central core, very painful with palpation, no signs of infection." Dr. Le diagnosed onychomycosis and very painful interphalangeal keratosis, subsecond, right side, recurring. Dr. Le reduced Plaintiff's mycotic nails and debrided IPK. Dr. Le found Plaintiff "appear[ed] not to be able to bear weight . . ., thus, . . . [Plaintiff] should be limited to a non-weight bearing type of work if possible" (R. 181).

On March 16, 2005, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by a state-agency physician. The state-agency physician found Plaintiff could

occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push pull unlimited (R. 157). The state-agency physician found Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl (R. 158). It was determined that Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. 159-60).

On March 26, 2005, Robert Solomon, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had affective disorders, specifically, depression, an impairment that was not severe (R. 164, 167). Dr. Solomon found Plaintiff had no restrictions of activities of daily living or difficulties in maintaining social functioning. Dr. Solomon found Plaintiff had not experienced episodes of decompensation. He opined Plaintiff had mild difficulties in maintaining concentration, persistence, or pace (R. 174).

On March 29, 2005, Plaintiff returned to Dr. Le at CVAMC with complaints of painful, thick nails. Dr. Le reduced Plaintiff's mycotic nails (R. 179).

On August 29, 2005, Dr. Le reduced Plaintiff's mycotic nails at CVAMC. He observed Plaintiff had no edema, cynosis, or infections. Plaintiff had no "open sores" on his feet (R. 178).

On October 11, 2005, Dr. Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push pull unlimited (R. 240). He found Plaintiff was occasionally limited in climbing, balancing, stooping, kneeling, and crouching (R. 241). Plaintiff had no manipulative, visual, or communicative limitations (R. 242-43). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold and heat, vibration,

and hazards, but was unlimited in his exposure to wetness, humidity, noise, fumes, odors, dusts, gasses, and poor ventilation (R. 243). He reduced Plaintiff's RFC to light (R. 244).

On October 24, 2005, Plaintiff presented to Dr. Le at CVAMC for foot follow-up care. Plaintiff complained of "painful, IPK, sub 2nd, right foot." There were no signs of infection. Dr. Le debrided the IPK (R. 258).

On November 7, 2005, Plaintiff presented to Stephen J. Cromwell, M.D., at CVAMC, with complaints of low back pain and right arm and leg pain. Plaintiff stated he did not experience numbness but that his pain had worsened. Dr. Cromwell noted Plaintiff had not been ". . . compliant with" appointments at CVAMC. Plaintiff ambulated with a limp and favored his right leg. His neck range of motion was normal and the examinations of his HEENT, chest and lungs were normal (R. 255). Plaintiff had no edema, normal pulses, no joint swelling, and normal ranges of motion upon examination of his extremities. Dr. Cromwell noted Plaintiff did experience pain on range of motion of his hip and knee and that the plantar aspect or his right foot was very tender and calloused. Dr. Cromwell observed Plaintiff's lumbar spine was very tender. Plaintiff had pain at forty-five degrees on leg raising examination. Dr. Cromwell diagnosed chronic low back pain with acute exacerbation and hypertension. Dr. Cromwell prescribed Felodipine, Tylenol #3, and Robaxin (R. 256).

Also on November 7, 2005, Plaintiff reported to Carol L. Messenger, staff nurse at CVAMC, that his pain was a "7" (R. 256-57). Plaintiff's blood pressure was 168/110. Plaintiff was cooperative (R. 257).

On November 28, 2005, Dr. Le debrided Plaintiff's IPK at CVAMC. There was no sign of infection (R. 254-55).

On February 13, 2006, Plaintiff presented to Dr. Jackson at CVAMC. Dr. Jackson noted

Plaintiff had "not seen [him] for over a year," but appeared that date for refill of his blood pressure medication. Plaintiff reported elevated blood pressure because he did not have medication to control it; chronic pain in his back, which radiated to his hip and leg; and painful interphalangeal keratosis. Dr. Jackson observed Plaintiff had gained a "substantial amount of weight," which was "going to be a detriment to him." Plaintiff requested referral to a pain clinic for injections to his back (R. 249).

Plaintiff's HEENT, respiratory, cardiovascular, gastrointestinal, and neurologic examinations were normal. Plaintiff's musculoskeletal examination was positive for back pain, which radiated to his right foot. Plaintiff's blood pressure was 150/96 and his weight was 214 pounds. Dr. Jackson found Plaintiff's lordotic curve was flattened, he had paralumbar muscle tenderness, he was "a little tightness to palpation to the muscles" in his back, he walked with a slight stoop, and his appearance had not changed from his prior examination. Plaintiff had no lesions on his feet, no edema or calf tenderness, and pedal pulses were present. Plaintiff's toenails were mycotic (R. 250).

Dr. Jackson found Plaintiff's blood pressure was not controlled and instructed Plaintiff to "get back" on his Lisinopril, Hydrochlorothiazide and Felodipine. Dr. Jackson opined Plaintiff had chronic back pain, prescribed Tylenol #3, and referred him to the pain clinic. Dr. Jackson noted Plaintiff had no neurologic deficits, "negative Lassgue's in his lumbosacral spine," and normal motor function (R. 251).

Also on February 13, 2006, Plaintiff reported to LPN Russell at CVAMC that his pain was an "8." His blood pressure was 160/100 (R. 252). A second read of his blood pressure was 150/96. Plaintiff was negative for PTSD and depression (R. 253). Plaintiff informed LPN Russell that he did not use assistive devices and that he had not recently fallen (R. 254).

On March 7, 2006, Dr. Le reduced Plaintiff's mycotic nails and debrided his IPK (R. 248-49).

15

On March 15, 2007, Plaintiff's blood pressure was checked at CVAMC and the readings were 180/102, 182/102, and 170/110. Dr. Jackson increased his medication dosages (R. 247-48).

Plaintiff's mycotic nails were reduced on May 9, 2006, by Dr. Le at CVAMC (R. 247).

Administrative Hearing

At the July 5, 2006, administrative hearing, Plaintiff testified he drove ten miles per week to doctors' appointments (R. 312). Plaintiff stated he could not work because of pain in his foot. He stated he walked on his heel. Plaintiff stated the pain was "going up the back of [his] leg and up to [his] back" (R. 314). Plaintiff stated his daily pain was a "ten" on a scale of one to ten. Plaintiff stated a "good day" was pain at a level "seven or eight" (R. 315). Plaintiff testified he did very little shopping, did no house work, visited his grandmother every week, showered and shaved himself, did not cook, infrequently carried groceries, did no laundry, did not vacuum, and had no hobbies (R. 316-17). Plaintiff stated his doctor had prescribed no home exercises to treat his condition. Plaintiff stated he walked very little (R. 317). Plaintiff testified Dr. Jackson had recommended he lose weight and walk; Plaintiff stated he walked around the house. Plaintiff stated he visited and was treated by Dr. Jackson monthly and by his podiatrist bimonthly (R. 318). Plaintiff stated he was to be treated at the pain clinic, beginning in October, 2006 (R. 319-20). Plaintiff stated his only source of income was his fiancée's federal government's disability of $603 per month for her having breast cancer and $303.23 in food stamps (R. 312-13).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Cannon made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2. The claimant has not engaged in substantial gainful activity since December 30, 2001, the alleged onset date (20 CFR 404.1520(b), and 404.1521 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe combination of impairments: interphalangeal keratosis of the right foot, onychomycosis, status post second metatarsal osteotomy of the right foot, degenerative arthritis of the right foot, hypertension and chronic back pain.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526, 404.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work that allows the option to sit or stand and involves only occasional postural movements and no climbing of ropes, ladders or scaffolds, extremes of heat or cold, hazardous machinery or unprotected heights or operation of foot controls.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 24, 1957, and is 49 years old, which is defined as a younger person age 45-49 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), and 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from December 30, 2001 through the date of this decision (20 CFR 404.1520(g) and 416.920(g) (R. 18-21).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

The Plaintiff contends:

1. ALJ Cannon erred in failing to fully and properly assess [Plaintiff's] testimony regarding his severe pain as required under 20 CFR 404.1509, SSR 96-7p and *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996.) [sic]

   A. The ALJ erred in failing to perform a proper second-step credibility analysis when she considered only one limited factor in her assessment of [Plaintiff's] statements about the intensity, persistence and limiting effects of his symptoms.

   B. The ALJ erred in failing to specifically and thoroughly discuss her findings and cite them to the record for support.

The Commissioner contends:

1.    The ALJ fully and properly assessed [Plaintiff's] credibility regarding his
complained-of pain.

## C. Credibility Analysis

Plaintiff contends the ALJ erred in failing to fully and properly assess his testimony regarding

his severe pain as required by 20 CFR 404.1509, SSR 96-7p and *Craig*, Id., in that 1) the ALJ failed

to perform a proper second-step credibility analysis of Plaintiff's statements about the intensity,

persistence and limiting effects of his symptoms and 2) the ALJ failed to specifically and thoroughly

discuss her findings [relative to Plaintiff's credibility] and cite them to the record. Defendant

contends the ALJ fully and properly assessed Plaintiff's credibility regarding his complained-of pain.

The Fourth Circuit has held that "[b]ecause []he had the opportunity to observe the demeanor and

to determine the credibility of the claimant, the ALJ's observations concerning these questions are

to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (citing *Tyler v.

Weinberger*, 409 F.Supp 776 (E.D.Va. 1976)).

In *Craig, supra*, the Fourth Circuit developed the following two-step process for

determinating whether a person is disabled by pain or other symptoms:

> 1)   For pain to be found to be disabling, there must be shown a medically
> determinable impairment which could reasonably be expected to cause not just pain,
> or some pain, or pain of some kind or severity, but *the pain the claimant alleges she
> suffers*.  The regulation thus requires at the threshold a showing by objective
> evidence of the existence of a medical impairment "which could reasonably be
> expected to produce the actual pain, in the amount and degree, alleged by the
> claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A)
> requires "objective medical evidence of some condition that could reasonably be
> expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective
> medical evidence a medical impairment reasonably likely to cause the pain claimed,
> *that the intensity and persistence of the claimant's pain, and the extent to which it
> affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) &
> 404.1529(c)(1). Under the regulations, this evaluation must take into account not

only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra,* at 594.

The ALJ in the instant case made the following finding: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produced the alleged symptoms . . ." (R. 19). The undersigned finds the ALJ fully complied with the first threshold step in *Craig;* therefore, the ALJ was required to evaluate Plaintiff's complaints of pain in conformance with step two of *Craig, supra.* In conducting step two of the analysis, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible. The [Plaintiff] described limited daily activities due to pain, but still drives and does some limited shopping. Based on the record as a whole, the undersigned finds the [Plaintiff's] complaints of chronic foot and back pain partially credible, to the extent that his capacity to perform light work is eroded as detailed above" (R. 19). Plaintiff argues that the ALJ considered only "one limited factor in her assessment" ("limited daily activities due to pain, but he still drives and does some limited shopping" (R. 19)) of Plaintiff's statements of intensity, persistence, and limiting effects of his pain, which was not in conformance with *Craig, supra,* and SSR 96-7p [Plaintiff's brief at p. 5 of Docket Entry 10].

In addition to the above listed criteria, as found in *Craig, supra,* SSR 97-7p requires the ALJ to consider the following criteria in her credibility analysis:

When the existence of a medically determinable physical or mental impairment(s)

that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . . .

In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

A review of the ALJ's decision finds she complied with the mandates contained in step-two of the *Craig* credibility analysis and SSR 96-7p in that she thoroughly considered Plaintiff's medical history, results of laboratory findings, objective medical evidence of record, medical treatment used to alleviate Plaintiff's pain, Plaintiff's activities of daily living, and Plaintiff's statements relative to his pain within the body of her decision. Additionally, the ALJ's decision contained "specific reasons for the finding on credibility" as required is SSR 96-7p and was supported by the record of evidence.

The ALJ considered Plaintiff's medical history. She evaluated Plaintiff's depression, chronic back pain, and right foot pain. She made specific findings as to their effects on Plaintiff's ability to do work and the degree of limitations they caused (R. 18-20)

In conformance with the mandates of step-two of the *Craig* analysis and SSR 96-7p, the ALJ considered and evaluated the objective medical evidence of record. As noted above, the ALJ considered Plaintiff's medically determinable impairment, depression, and evaluated the evidence

of record relative to that condition. The ALJ noted Plaintiff did not allege depression when he filed his application or at the Administrative Hearing. The ALJ considered and evaluated the record of evidence, provided by the CVAMC, relative to Plaintiff's depression. The ALJ evaluated the November 21, 2003, report by psychology trainee Philip Cromer, in which it was noted that Plaintiff was referred for "mild depression" (R. 18, 194). No diagnosis was provided. It was noted, however, that Plaintiff was cooperative, pleasant, had affect that was congruent with his mood, had "lots of family that he has interactions with," and, ultimately, refused any additional mental health treatment (R. 194-95). The ALJ considered the evidence provided by Dr. Jackson, who noted on February 20, 2004, that he "believe[d] Plaintiff was depressed," for which he prescribed Sertraline (R. 18, 197]. The ALJ also considered the opinion of the state-agency physician, who opined on March 26, 2005, that Plaintiff's depression was not severe and that he had no restrictions of activities of daily living, no difficulties in maintaining social functioning, and only had mild difficulties in maintaining concentration, persistence, or pace (R. 18, 164, 174).

Additionally, the ALJ's opinion that Plaintiff's depression caused no limitation was supported by other evidence of record. Plaintiff reported to LPN Russell that he had not felt "down, depressed, or hopeless" and that he had not lost "interest or pleasure in doing things" on October 19, 2004. Plaintiff's depression screening at CVAMC was also negative on February 13, 2006 (R. 253)

The ALJ also considered and evaluated the objective medical evidence relative to Plaintiff's low back pain. The ALJ considered Dr. Jackson's February 13, 2006, opinion that Plaintiff had no neurological deficits and normal motor function (R. 19, 215). The ALJ also assigned "significant weight" to the October 11, 2005, opinion of Dr. Franyutti that Plaintiff had exertional limitations that reduced him to light work (R. 19-20, 240-44). Additionally, in making her finding, the ALJ

considered records from CVAMC, which were from August 21, 2002, to August 29, 2005, and from October 24, 2005, to May 9, 2006 (R. 19). The objective medical evidence of those records supports the decision of the ALJ. Specifically, on July 1, 2003, Dr. Jackson found Plaintiff's examination was normal, Plaintiff did not have reflex sympathetic dystrophy, and he referred Plaintiff to physical therapy for his low back pain (R. 197). On January 22, 2004, Dr. Lough found Plaintiff's low back pain was a "direct result of his accommodative method of ambulation due to his right foot pain" and if Plaintiff's gait could be normalized, his low back symptoms would improve (R. 194). On January 25, 2005, Dr. Le found Plaintiff's neurovascular status was intact in his lower extremities (R. 181). On November 7, 2005, Dr. Cromwell found Plaintiff ambulated with a limp and favored his right leg, but he had no edema, normal pulses, no joint swelling, and normal ranges of motion in all extremities (R. 256). Dr. Cromwell noted Plaintiff had not been compliant with keeping his doctors' appointments (R. 255). Likewise, Dr. Jackson noted, on February 13, 2006, that Plaintiff had failed to return to his care for over a year (R. 249).

In addition to the evidence of record from CVAMC relative to Plaintiff's low back pain, the record contains the opinions of Dr. Biundo and state-agency physicians. Dr. Biundo found, on February 3, 2004, that Plaintiff had no significant low back pain "although he [felt] a little tight once in a while" (R. 140-41). Dr. Biundo found Plaintiff's upper and lower ranges of motion to be normal; his reflexes were normal; his balance and coordination were intact; his neuromuscular status was normal; and he had no tremors (R. 141). Dr. Franyutti found Plaintiff had exertional limitations that limited him to light work on February 23, 2004 (R. 145). On March 16, 2005, a state-agency physician found Plaintiff had exertional limitations that reduced him to light work (R. 157). These findings support the ALJ's opinion.

Relative to Plaintiff's foot condition, the ALJ evaluated the evidence of record that Plaintiff's April 19, 2003, plantar condylectomy of the second metatarsal head of the right foot did not relieve his foot pain. The ALJ noted that Plaintiff received conservative treatment form the Veterans' Affairs medical center for his foot condition. She relied on those office visit notes from CVAMC, which spanned from August 21, 2002, to August 29, 2005, and from October 24, 2005, to May 9, 2006, for support of her opinion (R. 19, Exhibits 6F and 8F]. On December 10, 2002, and March 11, 2003, Dr. Le found Plaintiff was neurologically grossly intact in both lower extremities and had no infection, edema, clubbing, or (R. 217, 216). On April 21, 2003, Dr. Le's post surgery examination of Plaintiff's right foot showed a wound that was well healed and with no signs of infections. On July 1, 2003, Dr. Lough found Plaintiff's physical examination was normal except for a callus on the ball of Plaintiff's right foot (R. 197). On January 22, 2004, Dr. Lough provided Plaintiff with a pair of crutches and an "orthowedge to reduce pressure off right forefoot during" ambulation (R. 194). On February 9, 2004, Dr. Lough found Plaintiff's right foot was "healing some" and had a soft callous tissue build up (R. 192). On October 19, 2004, Dr. Jackson diagnosed Plaintiff with a "large corn . . . that was quite tender to palpation" at the base of his second and third metatarsal (R. 187). On January 25, 2005, Dr. Le opined Plaintiff's IPK had recurred to his right foot; it was mild to moderate; he had no clubbing, edema, or cyanosis; but there was no sign of infection (R. 181). On April 29, 2005, Dr. Le found Plaintiff had no edema, cynosis, infections, or "open sores" on his feet (R. 178). The decision of the ALJ is supported by this evidence.

In addition to the objective medical evidence presented by CVAMC, the record of evidence contains objective medical evidence that supports the opinion of the ALJ. On April7, 2003, Dr. Finkle conducted a pre-surgery examination of Plaintiff and instructed him to be more active and

"get in better shape" (R. 210). Dr. Biundo opined, on February 3, 2004, that Plaintiff had normal ranges of motions of his toes and excellent capillary refill and that he had, what "appear[ed] to be . . . a plantar wart" on his right foot, but that there was no "evidence of bony erosions or any insult to the bony cortex . . ." of that foot (R. 141). Dr. Holsopple found Plaintiff had a hyperkeratotic lesion at the plantar aspect of his second metatarsal head on his right foot and a bone spur that protruded plantarly from his second metatarsal neck area. Dr. Holsopple found Plaintiff's pedal pulses were palpable and his epicritic sensation was intact. Dr. Holsopple also opined there was disparity in Plaintiff's examinations because there were "areas that were painful at one time, touch him again and they are not painful" (R. 152).

The ALJ considered and evaluated the medical treatment used to alleviate Plaintiff's pain. She noted Plaintiff treated his pain with Tylenol #3 (R. 18-19). Plaintiff's records from CVAMC also contained evidence of Plaintiff's medical treatment for pain. Plaintiff informed Dr. Le that he could not swallow pills (R. 215). Plaintiff reported to Dr. Jackson that he had not taken Terbinafin for his foot condition because he could now swallow pills. Plaintiff was instructed to crush his medication into food in order to administer it (R. 197). In addition to the notes as to Plaintiff's medication and treatments at CVAMC, Dr. Holsopple noted that Plaintiff had chosen to treat his foot condition with accommodative inserts because the recommended treatment included injections, and Plaintiff stated he had a fear of needles.[10] Dr. Holsopple also noted that Plaintiff and Plaintiff's fiancée asked for Percocet, but Dr. Holsopple prescribed Darvocet (R. 152). As noted above, Plaintiff's plantar region of his right foot was debrided often (R. 152, 81, 179, 181, 192, 258, 254,

---

[10]This asserted fear of needles is inconsistent with Plaintiff's February 13, 2006, request that the be referred to the pain clinic for injections to his back (R. 249).

255, 248, 249, 247). The above evidence supports the decision of the ALJ.

The results of the laboratory findings relative to Plaintiff's foot and back complaints support the finding of the ALJ. The March 11, 2003, x-ray of Plaintiff's right foot showed only "mild" changes associated with degenerative arthritis, but no significant skeletal or soft tissue abnormalities (R. 230). The July 1, 2003, x-ray of Plaintiff's lumbar spine showed a normal lumbar spine (R. 227). The March 5, 2004, x-ray of Plaintiff's right foot showed only mild degenerative changes at the interphalangeal joints and first metatarsophalangeal joint; a slight posterolateral subluxation of the proximal phalanx at the first metatarsophalangeal joint was suggested; cortical destruction along the medial surface at the distal end of the second metatarsal was suggested; and a smoothly marginated bony exostosis along the lateral surface of the distal second metatarsal, with uncertain etiology, was observed (R. 154) Even though the ALJ did not specifically refer to these laboratory results in her decision, she referred to the first right-foot x-ray and the x-ray of Plaintiff's lumbar spine when she considered the evidence submitted by the Veterans' Affairs [Exhibit 6F.] These laboratory findings show mild or slight changes, evidence of former surgery, and normal results; therefore, they support the finding of the ALJ.

In analyzing Plaintiff's complaints of pain, the ALJ considered his activities of daily living. As noted above, the ALJ acknowledged that Plaintiff he could drive a car and complete some limited shopping. The ALJ also noted Plaintiff walked (on his heel due to foot pain). The ALJ wrote, in her opinion, that she based her decision on the record as a whole, which included her consideration of Plaintiff's "described limited daily activities" (R. 19). Even though the ALJ did not list each activity of daily living that Plaintiff could or could not perform in her decision, the record of evidence, although it contained very few activities of daily living as described by the Plaintiff, supports her

finding. ~~On April 7, 2003, Plaintiff stated he had been very healthy throughout his life but had~~ become inactive due a problem with his foot (R. 209). Plaintiff did not describe his inactivity; however, Plaintiff reported on his February 24, 2005, Function Report that he used to partake in sports, such as running, camping, bicycling, playing football, playing basketball, and playing baseball, but could no longer do so (R. 94), 95, 97). Additionally, Dr. Solomon found Plaintiff had no restrictions of activities of daily living (R. 174). At the Administrative Hearing, while Plaintiff testified he did not do house work, did not cook, did not do laundry, and did not vacuum, he did not testify that he was, in any way, unable to do those activities because of his foot problem. He stated he did not engage in the sport hobbies in which he had previously engaged, but he gave no explanation for not engaging in substitute or alternative activities to occupy his time (R. 316-17). Plaintiff stated he did visit his grandmother weekly, infrequently carried groceries, and showered and shaved. Also at the Administrative Hearing, Glenda Mason testified that Plaintiff still "tri[ed] to do for other people" (R. 321-22). In his February, 2005, Function Report, Plaintiff wrote that he and his disabled fiancée "do for each other" (R. 91). He also reported he did not prepare meals because he used crutches, and that caused him to "just stand for a little period of time" (R. 92). In his September 20, 2005, Function Report, Plaintiff reported that he drove or used public transportation and could walk for twenty-five to thirty feet before he would have to rest (R. 122).

In her decision, the ALJ wrote she considered the record of evidence, which included Plaintiff's statements relative to his complaints of pain (R. 19). The undersigned finds Plaintiff's statements were not always consistent with the record of evidence. On April 21, 2003, Plaintiff stated to Dr. Le that he had no "further problems" with his right foot after the April 10, 2003, surgery (R. 201). On November 21, 2003, Plaintiff reported to Mr. Cromer, at CVAMC, that he had

experienced "problem[s]" with his foot but that he was "doing ok" (R. 194-95). On January 22, 2004, Plaintiff informed Dr. Lough, at CVAMC, that he had experienced back pain since his foot surgery, as he had changed his ambulation pattern to compensate for his foot condition. He stated that if he could walk "more normally . . . his back would improve" (R. 193). Dr. Lough provided Plaintiff crutches and an OrthoWedge to relieve the pressure on his foot so that his gait could be normalized and his low back symptoms could improve (R. 194). On February 3, 2004, Plaintiff reported to Dr. Biundo that he wore a modified shoe to eliminate pain in his foot and that his foot pain was completely eliminated with non-weight bearing. Plaintiff stated he had experienced only "a little" soreness in his back because he had been walking "funny" (R. 140). Dr. Biundo opined Plaintiff had a plantar wart that could be "treated and corrected" and Plaintiff could "return to a functional normal lifestyle" (R. 141). Then on February 9, 2004, Plaintiff reported continued right foot pain but significant reduction in pain to his lower back to Dr. Lough (R. 192). During an examination with Dr. Holsopple on March 5, 2004, Dr. Holsopple found disparity in Plaintiff's reaction in that he complained of pain upon examination of his foot in some areas, but not in the same areas as the examination continued (R. 152). Additionally, Plaintiff refused Dr. Holsopple's recommendation that he undergo full debridement of his foot because he claimed to have a fear of needles. Plaintiff and his finacée then requested Percocet for pain relief; however, on March 3, 2003, Plaintiff had informed Dr. Le that he could not swallow pills, and on July 1, 2003, Plaintiff informed Dr. Jackson he could not swallow Terbinafine, a pill prescribed for treatment of his foot (R. 197, 215). Plaintiff reported he could not stand, sit, lie down, or sleep in February, 2005 (R. 103). Plaintiff then reported, on September 20, 2005, that he could fold laundry because he could sit to perform that task. (R. 119). On November 7, 2005, Plaintiff informed Dr. Cromwell that his back

pain had worsened, but Dr. Cromwell found normal ranges of motion and noted Plaintiff had not been compliant with his appointments at CVAMC (R. 256). On February 13, 2006, Plaintiff reported chronic back pain that radiated to his hip and leg and painful interphalangeal keratosis to Dr. Jackson. Even though Plaintiff had stated earlier that he had a fear of needles, he requested a referral to the pain clinic to receive injections for his back pain (R. 249). Dr. Jackson noted no change in Plaintiff's appearance, except for significant weight gain, and found Plaintiff had no neurologic deficits, "negative Lassgue's in his lumbosacral spine," and normal motor function (R. 250-51).

At the Administrative Hearing, Plaintiff testified he visited his grandmother every week. In his September 20, 2005, Function Report, Plaintiff wrote he "tri[ed] to help his grandmother," who was ninety years old (R. 118). He testified he showered and shaved, but in his November 11, 2005, Function Report, Plaintiff wrote he needed help with bathing (R. 130, 316).

The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about the medical history and treatment, are important in the evaluation of credibility, as is the consistency of the individual's own statements. *See* SSR 96-7p.

Plaintiff also argues that the ALJ did not specifically and thoroughly discuss her findings and cite them to the record, as required by SSR 96-7p. Defendant asserts the ALJ fully and properly assessed Plaintiff's credibility regarding his "complained-of" pain [Defendant's brief at p. 8].

SSR 96-7p reads, in part, the following:

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations had been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision

must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight.

The ALJ did provide specific reasons for her finding on credibility, and those reasons were supported by the case record. In her decision, the ALJ found Plaintiff described his limited daily activities due to pain, but she found Plaintiff's complaints of chronic foot and back pain partially credible, based on the record as a whole. The ALJ provided specific reasons for this analysis. She found Plaintiff, despite his claim to limited daily activities due to pain, drove a car and completed limited shopping. She considered that Dr. Jackson found Plaintiff had no neurological deficits and had normal motor function of his back. She considered and evaluated Plaintiff's treatment for his back and foot condition were conservative throughout his care at CVAMC (R. 19). The ALJ made specific reference to the opinions of Dr. Franyutti, which were found in his October 11, 2005, evaluation of Plaintiff. Dr. Franyutti found Plaintiff could stand, walk, and/or sit for about six hours in an eight-hour workday (R. 19-20, 240). He found Plaintiff was occasionally limited in climbing, balancing, stooping, kneeling, crouching, and crawling (R. 19-20, 241). Dr. Franyutti found Plaintiff could perform light work, and this finding was based on his review of Plaintiff's medical records and his "back and rt. foot pain syndrome" (R. 19-20, 244).

For all of the above stated reasons, the undersigned finds that the ALJ's assessment of Plaintiff's testimony regarding his pain and her analysis of Plaintiff's credibility as to his statements about the intensity, persistence and limiting effects of his symptoms are supported by substantial evidence and that the ALJ specifically and thoroughly discussed her findings thereof.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's

decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _2/_ day of _February_ , 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE